# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| FARNHURST, LLC, et al., | ) | CASE NO. 5:13-cv-668 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| CITY OF MACEDONIA, et al., | ) | **AND ORDER** |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court are the following fully-briefed motions for summary judgment:

| Motion | Opposition | Reply |
|---|---|---|
| Doc. No. 192 – Defendant Donald Kuchta ("Kuchta") | Doc. No. 245, plus Doc. No. 228 (Objections to Kuchta Affidavit) | Doc. No. 256, plus Doc. No. 258 (Opposition to Objections) |
| Doc. No. 193 – Defendant Kenneth C. Martin ("Martin") | Doc. No. 241, plus Doc. No. 225 (Objections to Martin Affidavit) | Doc. No. 259, plus Doc. No. 258 (Opposition to Objections) |
| Doc. No. 194 – Defendants Nicholas Fini ("Fini") and Michael Hlad ("Hlad") | Doc. No. 231, plus Doc. No. 226 (Objections to Hlad Affidavit) and Doc. No. 227 (Objections to Fini Affidavit) | Doc. No. 257, plus Doc. No. 258 (Opposition to Objections)[1] |
| Doc. No. 195 – Defendant City of Macedonia ("City") | Doc. No. 247 | Doc. No. 261 |
| Doc. No. 197 – Defendant Joseph Migliorini ("Migliorini") | Doc. No. 222, plus Doc. No. 234 (Objections to Migliorini Affidavit) | Doc. No. 267, plus Doc. No. 251 (Opposition to Objections)[2] |
| Doc. No. 198 – Defendant Joseph W. Diemert, Jr. ("Diemert") | Doc. No. 237, plus Doc. No. 230 (Objections to Diemert Affidavit) | Doc. No. 271, plus Doc. No. 252 (Opposition to Objections) |
| Doc. No. 199 – Defendant Thomas M. Hanculak ("Hanculak") | Doc. No. 242, plus Doc. No. 229 (Objection to Hanculak Affidavit) | Doc. No. 272, plus Doc. No. 252 (Opposition to Objections)[3] |
| Doc. No. 203 – Plaintiffs Farnhurst LLC ("Farnhurst") and Frank Pla ("Pla") for declaratory judgment and partial summary judgment | Doc. No. 221 (Diemert and Hanculak)<br><br>Doc. No. 235 (Migliorini)<br><br>Doc. No. 240 (All City Defendants) | Doc. No. 268<br><br>Doc. No. 265<br><br>Doc. No. 266 |

---

[1] Plaintiffs filed a reply to Doc. No. 258. (Doc. No. 277.)

[2] Plaintiffs filed a reply to Doc. No. 251. (Doc. No. 255.)

[3] Plaintiffs filed a reply to Doc. No. 252. (Doc. No. 263.)

# I. PRELIMINARY MATTERS

There are several threshold matters relating to affidavits that the Court will address prior to resolution of the summary judgment motions. First, plaintiffs have objected to aspects of every affidavit filed by the various defendants in support of their dispositive motions. (*See* Doc. Nos. 225, 226, 227, 228; Doc. Nos. 229, 230; Doc. No. 234.)[4] Defendants filed their opposition briefs to the objections (*see* Doc. Nos. 258; Doc. No. 252; Doc. No. 251), and plaintiffs filed replies (*see* Doc. No. 277; Doc. No. 263; Doc. No. 255). In addition, all defendants have jointly moved to strike two affidavits filed by Jorge Pla (Doc. Nos. 254, 269), and for an order imposing sanctions on plaintiffs and their counsel for such filings. (Doc. No. 274.)[5] Plaintiffs filed a response (Doc. No. 278) and defendants filed a reply (Doc. No. 279).[6] The Court will address plaintiffs' objections first, and then defendants' joint motion.

## A.    Plaintiffs' Objections to Affidavits

Under the 2010 amendments to Rule 56, "[a] party may object that the material cited to support or dispute a fact *cannot be presented in a form that would be admissible in evidence*." Fed. R. Civ. P. 56(c)(2) (emphasis added). This amendment "works a sea change in summary judgment procedure and introduces flexibility (and consequent uncertainty) in place of the bright-line rules that are obtained previously." *Foreward Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *1 (W.D. Mich. Oct. 31, 2011). "Significantly, the

---

[4] Throughout this opinion, due to the number and variety of documents, the Court will refer to each only by its document number as reflected on the Clerk's docket. For any document not listed in the chart on page 1, at such document's first reference, the Court will include a bracketed description of the document. Pinpoint page number citations will be to the Page ID# assigned by the CMECF system.

[5] Defendant Joseph Migliorini has also filed a motion to show cause and for sanctions (Doc. No. 250) relating to plaintiffs' failure to comply with an earlier order of the Court (Doc. No. 171). Plaintiff has filed a brief in opposition (Doc. No. 275), and defendant Migliorini has filed a reply (Doc. No. 276). The Court will defer ruling on this motion, as it is unrelated to the dispositive motions.

[6] Plaintiffs' motion for leave to file a surreply (Doc. No. 280) is denied, there being no good cause for the additional filing.

objection contemplated by the amended Rule is not that the material 'has not' been submitted in admissible form, but that it 'cannot' be." *Id.* at *2. According to the Advisory Committee comments, "[t]he objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike." Fed. R. Civ. P. 56 (2010 Advisory Committee comments).

Here, plaintiffs' objections are two-fold: (1) that the affidavits do not "satisfy the requirements" of Rule 56(c)(4); and (2) that "the evidence on the record … contradicts the position [the affiant] is now attempting to establish." (Doc. No. 225 at 7079; Doc. No. 226 at 7096; Doc. No. 227 at 7107; Doc. No. 228 at 7133; Doc. No. 229 at 7150; Doc. No. 230 at 7166; Doc. No. 234 at 7387.)

### 1.        Objections relating to Rule 56(c)(4)

Plaintiffs first argue that, to the extent the affidavits do not meet the requirements of Rule 56(c)(4), they must be disregarded. (*See, e.g.*, Doc. No. 226 at 7097, citing cases.) Although making this non-compliance argument with respect to the affidavit of defendant Martin, plaintiffs' objections do not identify how Martin's affidavit fails that test. Therefore, as to Martin's affidavit's compliance with Rule 56(c)(4), plaintiffs' objections are overruled.

Regarding the affidavits of defendants Hlad, Fini, Kuchta, Hanculak, Diemert, and Migliorini, plaintiffs assert that statements such as "it appears" or "to the best of my knowledge" or "based on information and belief" demonstrate lack of personal knowledge and reliance upon hearsay. In particular, plaintiffs attack these defendants' reliance upon City records (such as local ordinances), conversations with other people (such as the City Law Director or

other City officials), and communications from PEHA,[7] a now dismissed defendant (such as PEHA's letters) to support some of their factual assertions.

Addressing first any affiant's attestation of facts based upon that affiant's review of relevant business records, the Court concludes that this does not offend the "personal knowledge" requirement of Rule 56(c)(4). In *Clark v. Main St. Acquisition Corp.*, 553 F. App'x 510 (6th Cir. 2014), brought under the Fair Debt Collection Practices Act, the Sixth Circuit affirmed the district court's ruling that a statement in an affidavit that the "facts recited herein are based upon the electronic business records" was truthful, as was the statement that it was based on "personal knowledge" of the entity's business records. *Id.* at 516. The Court noted that "[t]he least sophisticated consumer understands that lenders and debt collectors will by necessity have to rely on business records that they may not have personally created[.]" *Id.* The instant case is not dealing with debt collection, but the underlying principle set forth in *Clark* holds equally true as applied to ordinary business records in other contexts. *See, e.g.*, *Findlay Indus., Inc. v. Bohanon*, No. 3:07CV1210, 2007 WL 2669191, at *4 (N.D. Ohio Aug. 14, 2007) ("personal knowledge of the facts … recite[d] may be inferred from [the affiant's] general job duties and the content of the statement"); *AGI Realty Serv. Grp., Inc. v. Red Robin Int'l, Inc.*, No. 94-3911, 1996 WL 143465, at *4 (6th Cir. Mar. 28, 1996) ("Corporate officers are considered to have personal knowledge of the acts of their corporations and an affidavit setting forth those facts is sufficient for summary judgment.") (citation omitted).

Further, when statements like "it appears" or "to the best of my knowledge" or "based on information and belief" are made in conjunction with having reviewed business

---

[7] PEHA is Parkview Estates Homeowner's Association, Inc. It was incorporated on October 9, 1997. (*See* Doc. No. 203-1.) PEHA's Code of Regulations grants authority to the PEHA Board to manage and conduct the affairs of the Parkview Estates subdivision. (*See* Doc. No. 203-2.)

records, a court can construe that as meaning the affiant has attested to facts, as best he can, based upon business records. *AT&T Corp. v. Overdrive, Inc.*, No. 1:05CV1904, 2006 WL 3392746, at *2 (N.D. Ohio Nov. 21, 2006). *Overdrive* involved an affidavit made both on "personal knowledge" *and* "to the best of [the affiant's] knowledge and belief." The court concluded that "'[p]ersonal knowledge … is not strictly limited to activities in which the declarant has personally participated.'" *Id.* (quoting *Washington Cent. R.R. Co., Inc. v. Nat'l Mediation Bd.*, 830 F. Supp. 1343, 1352-53 (E.D. Wash. 1993) (further citation omitted)). "Personal knowledge can come from review of the contents of business records, and an affiant may testify to acts that she did not personally observe but which are described in business records." *Id.* (further citation omitted).

Moreover, each defendant whose affidavit is challenged holds a public office of some kind that necessitates reliance on the records of the entity the office-holder represents. *See* Fed. R. Evid. 803(8) (which excepts from the hearsay rule "[a] record or statement of a public office" so long as certain conditions are met). Those conditions are met here.

Finally, although generally rejecting plaintiffs' objections based on Rule 56(c)(4), the Court hereby notes those objections and will be mindful, as it always is on summary judgment, of any particular attested fact that specifically fails to meet the rule's requirement.

## 2. Objections relating to inconsistency

Any "objection" regarding inconsistencies between the affidavits and other record evidence is not the sort of objection contemplated by Rule 56(c)(2) (i.e., that the challenged material "cannot be presented in a form that would be admissible in evidence").

Generally speaking, therefore, the Court rejects plaintiffs' objections regarding inconsistency. That said, to the extent a party attempts to improperly contradict earlier deposition

5

testimony by inconsistent subsequent affidavit testimony, the Court will disregard the later testimony. *See Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 789 (6th Cir. 2002) (citing *Penny v. United Parcel Service*, 128 F.3d 408, 415 (6th Cir. 1997) ("a party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony") (further citation omitted)).

**B.    Defendants' Motion to Strike Plaintiffs' Affidavits**

On December 30 and December 31, 2015, plaintiffs filed notices accompanied by affidavits of their counsel, Jorge Luis Pla. (Doc. Nos. 254, 269.) The notices each declare the accompanying affidavits are "to be used as evidence in support of pleadings, at hearing and/or trial, or in any other alternative legal proceedings in the above captioned matter." (Doc. No. 254 at 8368; Doc. No. 269 at 8661.)  The affidavits then list several briefs and objections of record (Doc. Nos. 203, 222, 225, 226, 227, 228, 229, 230, 231, 234, 237, 241, 242, 245, 247, 265, 266, and 268), and declare that all the documents associated with these filings "are true and accurate copies[.]" (Doc. No. 254-1 ¶ 2; Doc. No. 269-1 ¶ 2.)

Defendants jointly filed a motion to strike the affidavits, arguing that: "Jorge Pla purports to authenticate engineering reports, land use and construction records made [by] the City and its building officials, e-mail messages and letters that are not addressed to him, Army Corps of Engineer records, real estate transaction records, accounting records that have not been attributed to any source, tax records, banking records, and everything else the Plaintiffs have filed with their various motions for or related to summary judgment." (Doc. No. 274 at 8713.)

Defendants also seek an order of this Court imposing monetary sanctions on plaintiffs and their counsel in the form of attorney fees and costs associated with defendants'

6

joint motion. Further, they seek an order requiring plaintiffs' counsel to "either withdraw the affidavits, or withdraw as counsel." (Doc. No. 274 at 8715.) This latter argument is based upon an earlier stipulation that resolved a defense motion to disqualify Jorge Luis Pla as plaintiffs' counsel. (*See* Doc. No. 64.) Defendants complain that plaintiffs and their counsel have repeatedly disregarded this stipulation and defied other court orders and warnings.

As defendants note: "[t]he breadth of what Plaintiffs propose is breathtaking." (Doc. No. 274 at 8713.) Even so, as argued by plaintiffs in opposition to the motion, defendants do appear to be relying upon an outdated version of Rule 56(e). Moreover, although the notices and affidavits of plaintiffs' counsel are somewhat unusual, they do not bind this Court in any way. The Court is certainly capable of determining, as it always does on summary judgment, the admissibility (or lack thereof) of any evidence presented to the Court.

The Court sees no reason to strike the documents and acknowledges that it will simply disregard evidence that does not satisfy Rule 56(c)(4). In light of that fact, no sanctions are warranted.[8] Accordingly, defendants' joint motion to strike and for sanctions (Doc. No. 274) is denied, with the caveat expressed herein.

Having resolved the issues relating to the various affidavits, the Court now turns to an analysis of the summary judgment motions.

## II. BACKGROUND

Plaintiffs Farnhurst and Pla (collectively, "plaintiffs") filed their complaint on March 27, 2013, and subsequently, with leave, amended the complaint on March 24, 2014. (Doc.

---

[8] Further, the Court concludes that defendants have misinterpreted the stipulation vis-a-vis its application to the affidavits of Counselor Pla. He is not testifying about anything substantive; rather he is merely attempting to attest, rightly or wrongly, to the authenticity of certain documents.

No. 73.)[9] As a result of previous rulings by this Court, there are twelve (12) remaining claims against eight (8) defendants: a claim for declaratory relief (Claim One); three estoppel claims (Claims Two, Three, and Seven); two claims of violation of the equal protection clause (Claims Four and Five); one claim for misuse of State authority/governmental obstructionism (Claim Six); one claim under the Fair Housing Act (Claim Eight); two claims of unspecified "intentional tort" (Claims Twelve and Thirteen); one claim alleging violation of 42 U.S.C. § 1983 (Claim Nine); and one claim alleging a civil rights conspiracy under 42 U.S.C. § 1985(3) (Claim Fourteen).

Underlying all the claims herein are allegations by plaintiffs that defendants, in various ways, obstructed Farnhurst's plans to split Lot 6 of the Parkview Estates Subdivision Phase I in the City of Macedonia into two sub-lots, north and south, so as to build a home on each sub-lot.

A recitation of the undisputed factual allegations gleaned from the first amended complaint and the various summary judgment briefs (both supporting and opposing) will help contextualize this ruling. Additional factual background may be included, as needed, in the discussion of the claims below.

Plaintiff Farnhurst is an Ohio limited liability company ("LLC") formed in November 2009 by Jorge Luis Pla (a non-party and one of plaintiffs' counsel in the case). Jorge Pla was born in Havana, Cuba and is now a naturalized citizen of the United States. (Doc. No. 73 ¶ 5.) Farnhurst holds title to Lot 6 in Parkview Estates, the lot that underlies this lawsuit. (*See* Doc. No. 203-9.)

---

[9] A motion for leave to file a second amended complaint (Doc. No. 135) – filed on July 14, 2015, well after the close of discovery – was denied. (*See* Doc. No. 163.)

Plaintiff Pla is a Cuban-American born in Cleveland, Ohio; he is a resident of the City of Macedonia. (Doc. No. 73 ¶ 6.) Pla was not originally a member of Farnhurst, but claims he became a 50% owner in late 2012 or early 2013, when he put up money to satisfy a Farnhurst debt.[10] (Doc. No. 185 [Pla Dep. I] at 4345-46.)

The remaining defendants, as already noted, are the City and various current or former public officials: Kuchta (former Mayor and Planning Commission Chair); Hlad (Building Commissioner since 2008); Fini (City Engineer since 2010; employed by GPD Group); Martin (City councilman from 2001 through 2013; in 2012, designated member of the City's Planning Commission); Migliorini (current Mayor, elected November 3, 2015); Diemert (City Law Director since 1990); and Hanculak (an attorney in Diemert's law firm since 1982, who has regularly provided legal services to the City and its various entities by assignment from Law Director Diemert).

Parkview Estates subdivision is a zoned R-1 residential community in the City; it is comprised of two phases. In May 1994, Parkview [Estates] Homeowners Association (i.e., PEHA) recorded its final Plat and its first Declaration of Covenants and Restrictions ("Declarations") for Phase I (Doc. No. 73 ¶ 27), as approved by the City Planning Commission.[11] These Declarations defined the "Grantor" as "the owner of the parcels of real estate[,]" who were Parkview Development Corporation and Mig-Can Investments. (Doc. No. 203-13 at 6102.) Defendant Migliorini signed this document as a partner in Mig-Can Investments. (*Id.* at 6133.)

---

[10] Defendants challenge whether Pla is actually a member of Farnhurst, arguing that there is no proof of his having been added as a member.

[11] This document is located in more than one place in the record. For ease of reference, the Court has utilized the copy attached to plaintiffs' dispositive motion. (*See* Doc. No. 203-13.)

The Declarations were amended and restated in 1996 (Doc. No. 203-14), but the relevant provisions remained unchanged from the original Declarations.

The recorded Plat map showed 45 lots (Doc. No. 203-13 at 6135), and the Declarations stated that there could be only "one building on each lot, consisting of a dwelling and garage."[12] There could also be "[a] storage building no larger than twelve (12) by eight (8) feet … permitted in the rear yard of each lot." (*Id.* at 6106 ¶ 6.)

Article III of the Declarations involves "Building Restrictions." Art. III ¶ 1 addressed "Variance," and provided that any provision in the Declarations could be modified by the Grantor or the homeowner's association (i.e., PEHA) "so as to permit different restrictions on any part of the Land or subdivide any and all of the Land if, in the judgement [sic] of the Grantor or the Association, such modification or subdivision will not do actual substantial material damage of [sic] any abutting or adjacent part of the Land." (Doc. No. 203-13 at 6107 ¶ 1.) "Land" was defined as "initially, the real estate described in Exhibit A [the plat map][.]" This definition further declared that "the real estate described in Exhibit A shall be subject to this Declaration on the Recording Date." (Doc. No. 203-13 at 6103 ¶ 1.)

On May 20, 2010, "Jorge Pla Member Farnhurst LLC" entered into a purchase agreement with the Ferrara Family Trust for the purchase of Lot 6 of Parkview Estates. Obligation to purchase the property was conditioned upon obtaining "approval of site plans and required variances" from PEHA and the City. (Doc. No. 235-6 at 7555.) Farnhurst apparently intended to split the lot into two unequal size lots, and build a home on each of the sub-lots, one of which would be occupied by Pla.

---

[12] The Declarations defined "Lot" and stated that "all Lots are depicted on the Plat (as such term is hereinafter defined)." (Doc. No. 203-13 at 6103.) "Plat" was identified as the drawing in Exhibit A to the Declarations. (*Id.* at 6105.)

On May 28, 2010, Farnhurst, with Ferrara's approval, applied for a hearing before the City Planning Commission to seek City approval to split Lot 6 in Parkview Estates into two sub-lots.[13] (Doc. No. 73 ¶ 35.) A hearing was scheduled for June 14, 2010. (*Id.* ¶ 36.)

Along with its application for hearing, Farnhurst submitted a plat showing the proposed split. (Doc. No. 203-15; Doc. No. 178 [Fini Dep.] at 3283.) The City sent the proposed lot split to an engineering consultant (GDP Group) for engineering review. (Doc. No. 178 at 3284-85.) On June 8, 2010, City Engineer Fini advised Building Commissioner Hlad, by written memorandum, that he had reviewed Farnhurst's submissions and believed the lot split could be approved by the City without a hearing before the Planning Commission, contingent upon resolving a few matters raised in the memorandum, including, but not limited to concerns about storm water control. (Doc. No. 73 ¶ 37; Doc. No. 194 at 5412.) Hlad, in turn, informed Pla that a hearing was not required. (*Id.* ¶ 38.) Farnhurst revised its plat in response to the identified matters of concern, and this revised plat underwent further review. (Doc. No. 203-16.) On July 7, 2010, Fini wrote to Hlad advising that, in his opinion, all review comments had been adequately addressed and, therefore, he recommended approval of the lot split. (Doc. No. 203-17; Doc. No. 178 at 3301-02.) On July 8, 2010, Planning Commission Chairman Kuchta approved the lot split, as is evidenced by his signature on the plat. (Doc. No. 203-19.)[14] The plat also bears the signatures of Fini and the trustee of the Ferrara Trust. (*Id.*)

---

[13] There appear to be at least two ways to seek approval for a lot split—by way of a public hearing or through a particular administrative process. (Doc. No. 203 at 6020.) Plaintiffs indicate that they "cannot state with certainty which process the City used[.]" (*Id.* at 6021.) Although plaintiffs sought a public hearing, it appears that the approval was done administratively.

[14] Kuchta testified at his deposition that, as Mayor and Planning Commission Chair, he relied entirely upon his professional staff to determine these matters and he merely signed when they asked him to. (Doc. No. 176 [Kuchta Dep.] at 2888-89; 2893-94.)

On July 1, 2010, legal title to Lot 6 was transferred by fiduciary deed from Ferrara to Farnhurst; the deed was recorded on July 19, 2010. (Doc. No. 203-9.) On July 26, 2010, the Summit County Fiscal Office (1) recorded the plat and legal descriptions evidencing the lot split approval; (2) designated the newly created south parcel as parcel number 33-13163 ("Lot 6 South"); (3) designated the newly created north parcel to remain as parcel number 33-10691 ("Lot 6 North"); and (4) recorded the new deeds for each new parcel. (Doc. No. 203-10.)

On April 18, 2011, Karen L. Spain, PEHA's President, wrote to Kuchta noting that on April 11, 2011, when Farnhurst requested a sewer easement, PEHA first learned that the City had approved the lot split.[15] Ms. Spain indicated that Lot 6, in the original subdivision plat, "was designated as a single residential lot with the majority of the site functioning as a detention/retention basin for the collection of storm water runoff." (Doc. No. 197-20 at 5748.) She further explained that, "[w]hile we know that the Plas' [sic] would build beautiful homes and landscapes on these properties, … [b]uilding a home on the smallest split lot may impair and infringe upon the storm water detention easement and … create a line of sight problem with north bound traffic [on the adjacent road]." (*Id.*) Ms. Spain noted that "[h]ad Farnhurst, LLC first approached the PEHA Board, it is highly unlikely that the PEHA Board would have approved a lot split." (*Id.*) Finally, Ms. Spain asked that the City "nullify its approval of this lot split and return Sub Lot 6 to a single lot as designated in the original Subdivision Plat[.]" (*Id.*) There is no indication that the City every complied with this request. (*See, e.g.*, Doc. No. 194 at 5410.)

Subsequently, plaintiffs submitted plans to the PEHA Board for one house on Lot 6 South. The Board reviewed the plans for compliance with PEHA's Architectural Review

---

[15] Jorge Pla served on the PEHA Board at the time Farnhurst (of which he was the sole member) purchased Lot 6. He never disclosed to the PEHA Board any of the activities relating to splitting the lot, despite his knowledge of the covenants and restrictions. (*See* Doc. No 182 [Migliorini Dep.] at 4084.)

Standards only (Doc. No. 235-4 [Spain Dep.] at 7514-20; Doc. No. 235-5 [Illig Dep. at 7546, 7548, 7552-53; Doc. No. 235-14 [Kowalski Dep.] at 7633-35, 7636-38), and approved the plans in September 2011 (Doc. No. 235-4 at 7520-21; Doc. No. 197-21 [Migliorini Aff.] at 5752 ¶ 19).

Plaintiffs next submitted plans for a second house to be constructed on Lot 6 North. Between the two submissions, one Board member's term expired (Doc. No. 235-4 at 7530-31) and two other members resigned  (Doc. No. 235-5 at 7551; Doc. No. 235-14 at 7639). Some time after June 2012, the new Board members (Migliorini, Linda McLellan, and Larry Zolata) approved the second submission, but on the condition there be only one house on Lot 6. (Doc. No. 197-21 at 5752 ¶ 22.)[16]

When plaintiffs submitted their application for a building permit in or around September 2011, the City ordered Farnhurst to re-appear before the City Planning Commission (*see* Doc. No. 203 at 6028), and required written confirmation from PEHA that plaintiffs' project conformed to the Declarations (Doc. No. 194 at 5414). Farnhurst never supplied the confirmation from PEHA.

Plaintiffs now assert that the above facts "call[] into question the objectivity with which City officials addressed this matter." (Doc. No. 203 at 6028.)[17]

---

[16] Paragraph 22 of Migliorini's Affidavit is not a paragraph that was challenged by plaintiffs. (*See*, Doc. No. 234.) Migliorini does not indicate any date for this second approval, but ¶ 20 of his affidavit references a letter from PEHA to Jorge Pla/Farnhurst dated June 25, 2012 wherein the Board's concerns about the second house were raised.

[17] It is notable that plaintiffs have apparently never appealed any action taken by the City or its agents to the Board of Zoning Appeals. (Doc. No. 194 at 5415.)

## III. DISCUSSION

### A.    Standard on a Motion for Summary Judgment

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

An opposing party may not rely merely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll.  v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the

14

applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

**B.  Analysis**

There are numerous arguments made within the eight (8) summary judgment motions. What is starkly evident from the above recitation of the undisputed facts supported by the record is that this is a local dispute over state and local issues that would ordinarily not be decided by a federal court. Plaintiffs have stated several federal claims in their amended complaint, establishing federal question jurisdiction. But that does not require this Court to retain supplemental jurisdiction over the state/local claims, which substantially predominate over the federal claims. (*See* 28 U.S.C. § 1367(c)(2).) Nor must the Court decide these state/local issues

merely because the parties have managed to draw this case out for a period of almost three (3) years.

Therefore, the Court intends to address the federal claims and, if they do not survive summary judgment, the Court will then determine whether to proceed with the state law claims or to dismiss them without prejudice under 28 U.S.C. § 1367(c)(3).

The Court construes the amended complaint as containing four federal claims. Although the amended complaint identifies Claim Nine as a "Violation of 42 U.S.C. § 1983" and alleges that defendants "deprived Farnhurst of its rights, privileges, and/or immunities secured by the laws and constitution of the United States[,]" no specific right, privilege, immunity, law, or constitutional provision is identified. The Supreme Court long ago made clear that § 1983 "[does] not provide for any substantive rights[.]" *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617, 99 S. Ct. 1905, 60 L. Ed. 2d 508 (1979). "[O]ne cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything." *Id.* Section 1983 only gives a remedy. Therefore, the Court construes the equal protection claims in Claim Four and Claim Five as being brought pursuant to § 1983. To the extent Claim Nine purports to assert an entirely separate claim for a "violation" of § 1983, it is dismissed.

### 1. Claims Four (§ 1983 Equal Protection – Class of One) [18]

Claim Four, brought against all defendants except Migliorini, alleges a violation of the Equal Protection Clause of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983,[19] on a theory that "*Farnhurst* is a class of one, and it has intentionally been treated differently from

---

[18] The individual defendants all raise various immunity arguments as a defense against the federal claims, but because the Court can decide the federal claims on their merits, the Court will not address immunity.

[19] To prevail under § 1983, a plaintiff must prove "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citations omitted). All of the individual defendants concede the second element.

others similarly situated, and there is no rational basis for the difference in treatment." (Doc. No. 73 ¶ 76, emphasis added.) The amended complaint recites the facts underlying this claim, beginning on September 9, 2011, when "Farnhurst, pursuant to City Ordinance No. 17-2008 and Local Ordinance 1129.06, submitted its building permit application … for the construction of a single family home on Sub lot 6 South[,]" (*id.* ¶ 77), and proceeding through a litany of steps Farnhurst was required to take in its unsuccessful efforts to obtain a building permit. The amended complaint then alleges:

> 95. No other person or business who purchased land located within the Parkview Estates Subdivision, Phase I for the purpose of constructing a single family dwelling on his or her lot was required to appear before the City Planning Commission pursuant to Local Ordinance 1137.05 as a pre-requisite to receiving his or her building permit.
>
> 96. The City, … Mayor and Planning Commissioner Kuchta, Building Commissioner Hlad, Engineer Fini, … Councilman and Planning Commission member Martin, City Law Director Diemert, City Assistant Law Director Hanculak, … acting as the State, have intentionally misinterpreted Local Ordinance 1137.05 *against Farnhurst*, and *singled out Farnhurst* for that misinterpretation.
>
> 97. The City, … Mayor and Planning Commissioner Kuchta, Building Commissioner Hlad, Engineer Fini, … Councilman and Planning Commission member Martin, City Law Director Diemert, City Assistant Law Director Hanculak, … acting as the State, have intentionally treated *Farnhurst and Pla* differently motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion or, to punish or inhibit the exercise of constitutionally protected rights or, by malicious or bad faith intent to injure Farnhurst and Pla.

(Doc. No. 73, emphases added.)[20] Notwithstanding the mention of Pla in ¶ 97, the amended complaint alleges only that Farnhurst is a class of one. (*Id.* ¶ 76.) The Court construes Claim Four as being brought solely on behalf of Farnhurst. Pla's individual equal protection claim is brought in Claim Five, discussed below.

---

[20] Several originally named defendants have been dismissed; therefore, their names have been omitted here.

The "class of one" equal protection challenge to state legislative and regulatory action was first enunciated in *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000), where Olech alleged that the Village of Willowbrook "demanded [that she have] a 33-foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15-foot easement from other similarly situated property owners." *Id.* at 565. Olech further alleged that "the Village's demand was irrational and wholly arbitrary[.]" *Id.* (internal quotation marks omitted). The Supreme Court concluded that, to succeed on a class of one theory, a plaintiff must show "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564; *see also Aldridge v. City of Memphis*, 404 F. App'x 29, 42 (6th Cir. 2010) (class-of-one is "somewhat of a misnomer; the hallmark of such a claim is not the allegation that *one individual* was singled out, but rather, the allegation of arbitrary or malicious treatment not based on membership in a disfavored class." (emphasis in original) (citations omitted).

"In determining whether individuals are 'similarly situated,' a court should 'not demand exact correlation, but should instead seek relevant similarity.'" *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012) (quoting *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000)). "Where a plaintiff succeeds in identifying similarly-situated individuals, plaintiff must also (1) refute every conceivable basis that might support the government action, or (2) demonstrate that the challenged action was motivated by animus or ill-will." *Benjamin v. Brachman*, 246 F. App'x 905, 927 (6th Cir. 2007) (citation omitted).[21] "This standard of review

---

[21] Plaintiffs argue incorrectly that, to succeed on a class of one claim, they must allege *either* disparate treatment of similarly situated individuals and no rational basis for such treatment *or* that the challenged government action was motivated by animus or ill-will. (Doc. No. 241 at 7995, citing *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 864 (6th Cir. 2012).) This misinterprets the case law. Showing animus or ill-will is not an *alternative* way to prove a

18

is 'a paradigm of judicial restraint,' growing out of … [a presumption] … that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *TriHealth, Inc. v. Bd. of Comm'r, Hamilton Cnty., Ohio*, 430 F.3d 783, 791 (6th Cir. 2005) (internal quotation marks and citations omitted).

The Sixth Circuit has noted that "[c]lass-of-one claims are generally viewed skeptically[.]" *Loesel v. City of Frankenmuth*, 692 F.3d 452, 461 (6th Cir. 2012). The court in *Loesel* explained:

> "In the wake of *Olech,* the lower courts have struggled to define the contours of class-of-one cases. All have recognized that, unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors. It is always possible for persons aggrieved by government action to allege, and almost always possible to produce evidence, that they were treated differently from others, with regard to everything from zoning to licensing to speeding to tax evaluation. It would become the task of federal courts and juries, then, to inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection review. This would constitute the federal courts as general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system."

*Id.* at 461-62 (quoting *Jennings v. City of Stillwater,* 383 F.3d 1199, 1210-11 (10th Cir. 2004) (footnote omitted).)

Farnhurst's class of one equal protection claim fails because plaintiffs have pointed to no record evidence (and the Court itself has found none – although it is not the Court's burden to search the record for evidence) to suggest Farnhurst was treated differently from anyone, much less a substantially similar individual or entity. This burden is theirs, and it is a heavy one. *See TriHealth*, 430 F.3d at 791 (affirming the district court's conclusion that

---

class of one claim; it is only an alternative way to establish one of the two elements of a class of one claim, namely, the lack of rational basis for plaintiffs' treatment by defendants.

plaintiffs "had not carried [their] heavy burden" under a class of one theory). Failure to establish this element is fatal to a class of one equal protection claim.

In opposition to the motion of defendant Kuchta, plaintiffs merely declare that "[they] are substantially similar to the other homeowners in Parkview Estates." (Doc. No. 245 at 8194, again mistakenly including Pla in this class of one claim belonging solely to Farnhurst.) In another opposition brief, plaintiffs argue that "[p]laintiffs' building permit application for a single-family home on Lot 6 South … was substantially similar in all circumstances to the other forty-four homes previously constructed within the subdivision." (Doc. No. 231 at 7229, continuing to insert Pla as a claimant under the class of one theory.)

But these two assertions are insufficient to establish that Farnhurst was similarly situated to anyone. Plaintiffs have not pointed out another owner in Parkview Estates who was permitted to split his/her lot and build a home on each sub-lot. If Farnhurst had had its way, it would have built two homes on Lot 6. The argument that the building permit application for the proposed home on Lot 6 *South* was similar to the other forty-four homes misses this point.[22] It was precisely this *split* and the proposal to build *two* homes on what was one lot in the original Plat that was the source of the problem.[23]

Plaintiffs have failed to establish the "similarly situated" element of a class of one claim under the equal protection clause. Therefore, summary judgment is granted in favor of all defendants on Claim Four.

_____

[22] In fact, since the original subdivision Plat contained 45 lots, the assertion that, at the time of Farnhurst's application, there were "forty-four homes previously constructed within the subdivision[,]" (Doc. No. 231 at 7229), actually suggests that Farnhurst, as owner of the 45th lot, was the *only* one to request a lot split and two homes.

[23] The record contains evidence at least *suggesting* a rational basis for defendants' actions with respect to Lot 6. (*See* Doc. No. 197-20 at 5748; *see also, TriHealth*, 430 F.3d at 790 ("disparate treatment of persons is reasonably justified if they are dissimilar in some material respect.").) Because plaintiffs have failed to establish the first element of Farnhurst's class of one claim, the Court need not address the second element and declines to do so lest it stray into the merits of the state law claims.

### 2.   Claim Five (§ 1983 Equal Protection Violation – Racial Origin)

In Claim Five, plaintiffs allege that the City officials privately "called into question the Pla brothers' racial origin and overall character." (Doc. No. 73 ¶ 99.)[24] They allege that they were variously referred to in closed-door meetings as "scum" and as having "ties to organized crime, perpetuating the stereotype that successful Cubans are likely associated with organized crime." (*Id*. ¶¶ 101, 102.) There were allegedly references made during these meetings of "possible violent retaliation if Farnhurst's building permit was not approved." (*Id.* ¶ 102.) On one occasion, Kuchta allegedly ordered the City police department to escort the Pla brothers out of a City Council meeting. (*Id.* ¶ 106.) Plaintiffs allege that "[n]o other Parkview Estate homeowner has been required, pursuant to Local Ordinance 1129.06, to procure a second written approval from PEHA indicating their topographic and construction plans conformed to the covenants and deed restrictions of the subdivision." (*Id.* ¶ 113.) Plaintiffs conclude by asserting that defendants "have intentionally misinterpreted Local Ordinance 1129.06 against Farnhurst, and singled out Farnhurst for that misinterpretation." (*Id.* ¶ 114.) Finally, they allege that defendants "have intentionally treated Farnhurst and Pla differently[,] motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion or, to punish or inhibit the exercise of constitutionally protected rights, or, by malicious or bad faith intent to injure Farnhurst and Pla." (*Id.* ¶ 115.)

Parts of Claim Five echo the class of one theory already addressed above, but the Court construes Claim Five as raising a different, and separate, claim of Pla's disparate treatment allegedly based upon an impermissible ethnic classification.

---

[24] Although plaintiffs' counsel, Jorge Luis Pla (one of the "Pla brothers"), was at all relevant times the sole member of Farnhurst, he is not a party to this lawsuit. Only Frank Pla, who is arguably now a member of Farnhurst, is a named plaintiff.

As a threshold matter, defendants all argue that Pla has no standing to bring this claim because Farnhurst, not Pla, owned Lot 6 and sought the lot split and building permit(s). To assert claims under federal law, a plaintiff must have standing. The Supreme Court has "established that the irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). First, plaintiff must have suffered an injury in fact, that is, an invasion of a legally protected interest that is both concrete and particularized *and* actual or imminent, as opposed to conjectural or hypothetical. Second, the injury must be traceable to the actions of the defendant. Third, it must be likely, not just speculative, that the injury will be redressed by a favorable decision. *Id.* at 560-61 (all citations omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561 (citations omitted).

In addition to these constitutional requirements for standing, a plaintiff must meet "prudential requirements for standing developed by the Supreme Court." *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 206 (6th Cir. 2011). "First, a plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties. Second, a plaintiff must present a claim that is more than a generalized grievance. Finally, the complaint must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* (internal quotation marks and citations omitted). It is the prudential requirements of standing that underpin defendants' arguments.

Kuchta, Martin, and Fini/Hlad all assert in their motions that a member of an LLC (such as Pla) lacks standing to assert claims individually where the claims belong to the company and not to the individual. (Doc. No. 192 at 5371; Doc. No. 193 at 5396; Doc. No. 194 at 5417)

22

(all citing *Sobh v. Am. Fam. Ins. Co.*, 755 F. Supp. 2d 852, 856 (N.D. Ohio 2010).) The City, Diemert, and Hanculak raise a similar argument, further adding that Pla was not even a member of Farnhurst at all relevant times.[25] (Doc. No. 195 at 5449; Doc. No. 197 at 5814-15; Doc. No. 199 at 5922 n.2.) Migliorini[26] makes similar assertions, further asserting that, under Ohio Rev. Code § 1704.14(B), Pla has no ownership interest in the property that is the subject matter of this litigation because he cannot actually establish that he is a member of Farnhurst even now. (Doc. No. 197 at 5484-86.)

In opposition to the legal arguments of Kuchta and Martin,[27] plaintiffs argue that Pla suffered a sufficient injury in fact to generally establish his constitutional and prudential standing because he "intended to live in the house to be built on Lot 6 South." (Doc. No. 245 at 8198; Doc. No. 241 at 7998.) He claims that "it is well-settled law in Ohio that '[a]n intended third party beneficiary to a contract may bring a contract action.'" (*Id.*, quoting *Lapping v. HM Health Servs.*, No. 2000-T-0061, 2001 WL 1602683, at *3 (Ohio Ct. App. Dec. 14, 2001).) Plaintiffs assert the same opposition to the arguments of the City and Diemert, but fail to separately address these defendants' argument that Pla was not a member of Farnhurst *at all relevant times*, but only became a member later. (*See* Doc. No. 247 at 8293-95; Doc. No. 237 at

---

[25] The City also argues, with respect to both Claims Four and Five, that it is entitled to summary judgment because plaintiffs have neither alleged nor established *Monell* liability on the part of the City. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691-94, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (doctrine of respondeat superior is inapplicable to § 1983 actions; municipal liability must be based on action taken pursuant to official policy or custom). This is correct and, therefore, the City is entitled to summary judgment on both Claims Four and Five.

[26] Although Migliorini is mentioned in ¶ 103 within Claim Five, the Court does not read the amended complaint as alleging an equal protection claim against Migliorini. (*See* Doc. No. 73 ¶¶ 114, 115.) Even so, he seeks summary judgment on this claim.

[27] Although Fini and Hlad raise the same legal arguments on standing as do Kuchta and Martin, plaintiffs advanced no opposition to their arguments in this regard. (*See* Doc. No. 231, containing no arguments on standing; *see also* Doc. No. 257 at 8392.)

23

7835-36.)[28] Finally, as to the argument of Migliorini under Ohio law, plaintiffs argue that Migliorini is simply incorrect that plaintiffs needed either an operating agreement or a written consent from Jorge Pla to Frank Pla to make the latter a member of Farnhurst. (Doc. No. 222 at 6845-46.)

Pla did not allege in the amended complaint that he is a third-party beneficiary; he only identified himself as "an authorized representative of Farnhurst." (Doc. No. 73 ¶ 6.)[29] His first claim to third-party beneficiary status is in plaintiffs' various opposition briefs.[30] A third-party beneficiary is "[s]omeone who, though not a party to a contract, stands to benefit from the contract's performance. For example, if Ann and Bob agree to a contract under which Bob will render some performance to Chris, then Chris is a third-party beneficiary." BLACK'S LAW DICTIONARY 1894 (10th ed. 2014). Thus, "third-party beneficiary" is a concept that has meaning in a contract context. Even the *Lapping* case relied upon and quoted by plaintiffs is a case involving an argument that the plaintiff had "intended beneficiary rights under [a] purchase agreement." *Lapping*, 2001 WL 1602683, at *1. Plaintiffs have not pointed to a single case where a plaintiff was entitled to sue as a third-party beneficiary under anything other than a contract theory.

Even generously assuming that Pla was a third-party beneficiary of the purchase agreement between Farnhurst and the Ferrara Family Trust relating to Lot 6, plaintiffs have not

---

[28] Although Hanculak raised the same arguments as the City and Diemert, plaintiffs have not opposed Hanculak's argument with respect to standing. (*See* Doc. No. 242.)

[29] During his deposition, Pla attempted to morph the fact that "everybody knew we were applying for a house for me," (Doc. No. 186 [Pla Dep. Vol II], at 4632), into some sort of "trust," stating that "a trust exists and people are beneficiaries to a trust[.]" (*Id*. at 4633.) But he admitted that there was never any formal trust to his benefit executed by Farnhurst. (*Id.*)

[30] Although Pla does allege in the amended complaint that defendants "were aware … [that he] intended to live in the single-family home to be constructed on Sub lot 6 South[,]" (Doc. No. 73 ¶ 129), he does so solely in the context of a Fair Housing Act claim. At best, this allegation might establish his individual standing to assert that one claim, which will be separately discussed below.

asserted any breach of that agreement such that Pla, as a third-party beneficiary, was damaged or injured. That agreement went off as planned – Ferrara passed title to Farnhurst – and the amended complaint does not allege to the contrary.

Defendants also argue correctly that a member of a limited liability company cannot bring an action to redress injuries to the LLC. *See Sobh, supra*, at 856 (finding no reason to depart, in the context of a limited liability company, from the general rule that a sole stockholder of a corporation cannot maintain an action to redress injuries to the corporation in his own name) (citing *Canderm Pharmacal, Ltd. v. Elder Pharm., Inc.*, 862 F.2d 597, 602-03 (6th Cir. 1988)). Although the Sixth Circuit has recognized an exception to this rule, "where the shareholder suffers an injury separate and distinct from that suffered by other shareholders, or the corporation as an entity[,]" *Quarles v. City of E. Cleveland*, No. 99-3050, 1999 WL 1336112, at *3 (6th Cir. 1999) (per curiam), Pla (assuming he is a member of Farnhurst) has not alleged any such separate injury sufficient to establish standing in his individual right, separate from the LLC.

Finally, although Pla does not address defendants' argument that he was not a member of Farnhurst at any relevant time (or perhaps not even a member today), in light of the case law discussed above regarding a member's right to maintain an individual action to redress the entity's injury, the Court need not separately address these arguments.

Reserving a ruling with regard to Pla's standing to maintain Claim Eight until the discussion below regarding that claim, the Court concludes that all defendants are entitled to

dismissal of Claim Five. To that extent, each defendant's motion for summary judgment is granted.[31]

### 3. Claim Eight (Fair Housing Act – Racial Origin and Familial Association)

In Claim Eight plaintiffs allege:

> 129. All Defendants were aware Frank Pla, a Cuban-American and single parent of two daughters without marriage to either mother, intended to live in the single-family home to be constructed on Sub lot 6 South.

> 130. By denying the legality of the Sub lot 6-lot split, staying the effectiveness of the topographic and construction plans, and consequently refusing to grant a building permit for Sub lot 6 South, all Defendants, whether private or state actors, individually and collectively, have intentionally given effect to the discriminatory, anti-minority biases of the City's citizens and therefore violated the Fair Housing Act.

(Doc. No. 73.)

"The Fair Housing Act, broadly speaking, prohibits discrimination in the sale or rental of housing and in the provision of housing services or facilities 'because of race, color, religion, sex, familial status, or national origin.'" *Hollis v. Chestnut Bend Homeowner's Ass'n*, 760 F.3d 531, 537 (6th Cir. 2014) (quoting 42 U.S.C. § 3604(a), (b)). Like Title VII, the Act "prohibit[s] intentional discrimination, known as disparate treatment, as well as 'practices that are not intended to discriminate but in fact have a disproportionately adverse effect' on a protected class, known as disparate-impact claims." *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009)).[32] To establish their claim, plaintiffs must prove that "discriminatory purpose was a motivating factor in the [defendants'] decision."

---

[31] The Court also notes that the purpose of antidiscrimination laws is not to provide a general code of civility or to prevent unkind words being spoken, even by state actors.

[32] Plaintiffs' allegations do not fit squarely within either of these two theories.

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 270, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977).

As a threshold matter, the Court doubts that Pla has standing to assert this claim. Although "federal courts have, on several occasions, found that *landowners* claiming injury as a result of discriminatory city zoning and building laws, had standing to bring suit in their own behalf[,]" *Turner v. City of Englewood*, 195 F. App'x 346, 352-53 (6th Cir. 2006)  (citing cases), as already noted in the discussion of Claim Five, Pla was not (and is not) the owner of Lot 6, nor does he allege that he would have been an owner of either of the sub-lots had Lot 6 been successfully split. At most, he has alleged that he intended to live in the house that would have been built on Lot 6 South, although he does not allege that he would have owned the house.

Even assuming that this allegation is sufficient to demonstrate Pla's "personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction[,]" *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982), plaintiffs nonetheless fail to establish the requisite discriminatory animus to support a claim under the Fair Housing Act.

Broadly construing the complaint, plaintiffs allege only that, because Pla is Cuban-American or, perhaps, because of his familial status as a single, unmarried parent,[33] defendants intentionally "[gave] effect to the discriminatory, anti-minority biases of the City's citizens and therefore violated the Fair Housing Act." (Doc. No. 73 ¶ 130.) Plaintiffs do not actually allege that defendants themselves exhibited any discriminatory animus nor, for that

---

[33] Plaintiffs also do not allege that Pla's daughters (whose ages are unknown) would have lived with him in the proposed house. The Fair Housing Act only protects "familial status" to the extent that a child who has "not attained the age of 18 years" will be "domiciled with… a parent or another person having legal custody of [that child.]" 42 U.S.C. § 3602(k). The Act is designed, in part, to guard against attempts to keep children out of certain housing.

matter, do they allege any facts in support of their bald assertion that the citizens of the City have an anti-minority bias.

At best, plaintiffs have come forward with what, in the summary judgment context, is barely a "scintilla" of evidence – that "during a closed-door meeting, [Kuchta] referred to the Pla brothers as 'scum' and not worthy of living in the City[,]" and that "during a closed-door meeting, [Martin] suggested the possibility that the Pla brothers had ties to organized crime," and "warned the City and its officials should be concerned with and take precautions against possible violent retaliation if Farnhurst's building permit was not approved." (Doc. No. 73 ¶¶ 101, 102, incorporated by reference into Claim Eight.) The only testimony in the record that supports these allegations is that of Councilwoman Sylvia Hanneken. (Doc. No. 215 [Hanneken Dep.] at 6405 (Kuchta called the Plas "scum"); at 6406 (but she "did not know why" he said that);[34] at 6416 (Martin told her "the Plas are Cuban mafia"); at 6417 (and that her conclusion was that the City's evaluation of the building permit application "had something to do with" that opinion of Martin; but that no one else in the City administration had stated a similar opinion).)[35]

---

[34] Notably, when plaintiffs deposed Kuchta, they never asked him any questions related to this disparaging remark he had allegedly made, nor did they inquire as to his knowledge of any remarks having been made relating to "Cuban mafia." (*See* Doc. No. 176 [Kuchta Dep.].)

[35] When questioned whether he knew the Plas' national origin, defendant Fini testified that sometime "end of 2011, beginning of 2012[,]" he "heard a comment in regard to Cuban mafia[,]" and could not say for certain but "recall[ed] it being Ken Martin." (Doc. No. 178 at 3416.) He thought it may have been "at a work session prior to a council meeting[.]" (*Id.* at 3449.) Even so, he denied that national origin was a factor in any of his own decisions and did not believe it influenced any City official. (*Id.* at 3416-17.) Defendant Martin was questioned about his allegedly having referred to Pla as part of the "Cuban mafia," and he denied it. In fact, Martin, who had been the lawyer representing the mother of one of Pla's daughters in a legal dispute of some sort (where Pla was represented by his brother, Jorge Luis Pla), insisted that it was Pla's counsel who had brought up the mafia, alleging that Migliorini had some sort of mafia ties. (Doc. No. 173 [Martin Dep.] at 2857-59.) Karen Spain, president of PEHA, and Thomas Illig, a member of the PEHA board, both denied ever hearing any City official refer to the Plas' national origin. (Doc. No. 179 [Spain Dep.] at 3670-71; Doc. No. 181 [Illig Dep.] at 3950.)

When questioned about these allegations at his deposition, Pla himself was unclear and evasive as to the basis for his claims of discriminatory animus. He testified as follows:

Q.    But, again, what you've alleged, one of the 20 things you've alleged in the complaint is that you were, you and Farnhurst were discriminated against for a couple of reasons: Your Cuban American heritage and the fact that you were a single father of two daughters with different mothers; so how do you think those two things, I mean do you think those two things were factors in all of the roadblocks and screwing over of you by the city and its officials?

A.    I think that they're a factor in that one of the main players is stating these things publicly in front of other people. I don't know their frame of mind or their thought process. Sometimes you're in a room of people and somebody tells a tasteless joke and you chuckle and later you think that was one of the dumbest things I ever heard anyone say so what they got from it, what they didn't get from it, whether the motivation was simply Mr. Migliorini or the desire not to have the two lots built there or Mr. Martin's involvement and saying we got to keep these people out of here, I have no idea what went on behind closed doors.

Q.    When did Martin say we've got to keep these people out of here?

A.    I'm sorry. That was a presumption of my part.

Q.    You never heard him say that?

A.    No. I just heard this Cuban mafia and whatever and obviously others have heard it as well.

Q.    Well, Cuban mafia and whatever, what's the whatever? You told me about the –

A.    The whatever, the single parent, the other topics that you brought up would be the –

Q.    Well, did you ever hear Ken Martin or anyone else commenting on your status in the City of Macedonia proceedings, did you hear Martin or anybody else commenting on your status as a single father of two daughters with different mothers?

A.    No, I never heard another comment but I was subjected to a derogatory hand gesture at a meeting in city hall previous to one or two or which meeting, I don't recall but I was in the back room, which I think is where they hold executive or premeetings, I don't know what they call them, and I was sitting with Sylvia Hanneken and forward to my right in the middle of the table was Mayor Kuchta and Mayor Kuchta was giving me a real glare, staring at me and proceeded to make a hand gesture taking his thumb to his nose and going like that to me while we were in the meeting and I indicate that he was snubbing his nose and giving me the finger at the same time so as far as feeling hostility from the city, I was definitely feeling it.

Q.    Well, again, that gesture, is there a name for that?

A.    I don't have a name other than how I described it.

Q.    Well, I want to describe it accurately if there's a name; but since there's not, we'll just refer to it as "the gesture"?

A.    Or "the finger." How's that?

Q.    Is that a gesture directed to someone the gesturer just doesn't like or does it have any specific context for Cuban Americans or single fathers of daughters with two different mothers?

A.    I will end the topic, from my perspective, I don't know. I really don't know.

Q.    It doesn't have any significance within Cuban American culture, does it?

A.    No.

(Doc. No. 185 at 4415-18.)

       This record evidence is no more than a scintilla. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

       Finally, although the "unlawful practices [in the Fair Housing Act] include zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification[,]" *Texas Dep't of Hous. & Cmty. Affairs v.*

*Inclusive Communities Project, Inc.*, -- U.S. --, 135 S. Ct. 2507, 2522, 192 L. Ed. 2d 514 (2015), the Court notes that Jorge Pla currently owns property within Parkview Estates and lives there himself. Frank Pla also owned property and lived in Parkview Estates for eleven years until he lost his property and home to foreclosure when his real estate business was improperly positioned to withstand the market crash in 2008. (*See* Doc. No. 185 at 4331-33.) These facts cut against any conclusion that the scintilla of evidence in the record would be reasonably sufficient to show some design to keep Cubans or Cuban-Americans or single parents like Pla out of Parkview Estates.

Plaintiffs have failed to establish any violation of the Fair Housing Act and, therefore, all defendants are entitled to summary judgment on Claim Eight.

### 4.    Claim Fourteen (Civil Rights Conspiracy – 42 U.S.C. § 1985(3))

In this claim, plaintiffs allege as follows:

155. All Defendants, whether private or state actors, have conspired with the intent to deprive Farnhurst and Pla, either directly or indirectly, of equal protection of the laws, or equal privileges and immunities under the laws.

156. As a direct and proximate result, Farnhurst has been deprived of constructing a single family dwelling on Sub lot 6 South and a single family dwelling on Sub lot 6 North.

(Doc. No. 73.)

In *Griffin v. Breckenridge*, 403 U.S. 88, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971), the Supreme Court identified the following criteria for measuring whether a complaint states a cause of action under § 1985(3):

To come within the legislation a complaint must allege that the defendants did (1) 'conspire or go in disguise on the highway or on the premises of another' (2) 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.' It must then assert that one or more of the conspirators (3) did, or

31

caused to be done, 'any act in furtherance of the object of [the] conspiracy,' whereby another was (4a) 'injured in his person or property' or (4b) 'deprived of having and exercising any right or privilege of a citizen of the United States.'

*Id.* at 103. "Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372, 99 S. Ct. 2345, 60 L. Ed. 2d 957 (1979). Therefore, "[t]he rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere[.]" *Volunteer Med. Clinic, Inc. v. Operation Rescue*, 948 F.2d 218, 226 (6th Cir. 1991) (internal quotation marks and citations omitted). Further, "a plaintiff alleging a conspiracy to deprive her of her civil rights must establish that the alleged conspirators *shared* a common discriminatory objective." *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 368 (6th Cir. 2012) (emphasis in original). "'While they need not produce direct evidence of a meeting of the minds, [plaintiffs] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective.'" *Id.* (quoting *Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416, 421 (4th Cir. 1996)). For this reason, "conspiracy claims must be pled with some degree of specificity and … vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim." *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987). Finally, "[c]ourts have traditionally viewed conspiracy suits against public officials with suspicion and disfavor." *Fisher v. City of Detroit*, No. 92-1759, 1993 WL 344261, at *5 (6th Cir. Sept. 9, 1993).

Although Claim Fourteen incorporates all the preceding allegations by reference, the allegations, taken as a whole, fail to establish any conspiratorial linkage between the individual actions of the individual defendants. Plaintiffs have failed to establish any meeting of the minds of defendants aimed at depriving them of their civil rights. At best, they have shown

32

that a couple of the defendants may have had some personal animosity toward them (i.e., making random disparaging remarks and giving Pla "the finger"). Therefore, plaintiffs have no claim under § 1985(3) and defendants are entitled to summary judgment.

## IV. CONCLUSION

For the reasons set forth above, plaintiffs have failed in their burden to establish any of their federal claims that brought this fundamentally local dispute to federal court. Defendants are all entitled to summary judgment on all of plaintiffs' federal claims. Therefore, Doc. Nos. 192, 193, 194, 195, 197, 198 and 199 are all granted in part.[36]

Having resolved all the federal claims, pursuant to 28 U.S.C. § 1367(c)(2) & (3), the Court declines to exercise supplemental jurisdiction over any of the state claims and dismisses them all without prejudice.[37]

But, before entering final judgment, the Court will offer the parties another opportunity to resolve all issues in the case. By noon on February 16, 2016, the parties shall jointly advise the Court in writing whether they would like to have this case referred to Magistrate Judge Limbert for mediation. If the parties are not in agreement to mediate the case,

---

[36] The Court notes that plaintiffs' motion for summary judgment addresses only Claims One, Two and Three. Claims Two and Three are state law claims, and Claim One (for declaratory judgment) is inextricably tied to the state law claims. Therefore, the Court denies plaintiffs' motion (Doc. No. 203) without prejudice.

[37] Although plaintiffs have not prevailed on any of their federal claims, the Court takes no position on the merits of their state law claims. These are matters that should be decided by local authorities and/or local courts, with their intimate understanding of local laws and policy concerns; these are not matters for a federal court. *See Blazy v. Jefferson Cnty. Reg'l Planning Comm'n*, 438 F. App'x 408, 415 (6th Cir. 2011) (given that the remaining claims "hinge[ ] upon various provisions of Ohio and local law, … the district court acted well within its discretion in declining to review [the claims].") (quoting *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 233 (6th Cir. 1997) ("if the federal claims are dismissed before trial, … the state claims [generally] should be dismissed as well.") (alteration in original)). Therefore, even if the Court had not granted summary judgment on the federal claims, it would still decline supplemental jurisdiction over all of the state law claims.

the Court will enter final judgment in accordance with this Memorandum Opinion and Order. If the parties agree to mediation, it must be completed by no later than February 29, 2016.

**IT IS SO ORDERED**.

Dated: February 10, 2016

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**